Anderson & Karrenberg
50 West Broadway
Suite 700
Salt Lake City, UT 84101
Thomas R. Karrenberg
Leslie Orgera

Richard A. Kaplan
830 Linwood Avenue
Saint Paul, MN 55105
I.D. 0053661

***Attorneys for Plaintiff***

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **CAMERON FILTERS, LLC,** a Minnesota limited liability company**, d/b/a/ HTIF CAMERON FILTERS d/b/a/ HTIF**; | **COMPLAINT** |
| Plaintiff, | |
| v. | Civil No. _____ |
| **EXACT SOFTWARE NORTH AMERICA, INC., EXACT SOFTWARE NORTH AMERICA LLC,** | Judge _____ |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, Cameron Filters, LLC, d/b/a/ HTIF Cameron Filters d/b/a/ HTIF ("Cameron Filters") for its Complaint against Defendants Exact Software North America, Inc., and Exact Software North America, LLC ("Exact"), alleges as follows:

## PARTIES

1.      Plaintiff Cameron Filters is a Minnesota Limited Liability Corporation with its corporate headquarters in Minnesota and its principal place of business, at the time of the events alleged herein, in Cameron Wisconsin.  Plaintiff's principal place of business is now located in Saint Paul, Minnesota.

2.      Defendant Exact Software North America, Inc., is an Ohio corporation and Defendant Exact Software North America, LLC, is either a Massachusetts or Ohio limited liability company – state records are unclear.   Both Defendants have their corporate headquarters and principal place of business in Middleton, Massachusetts, one or both have an office in Minnesota and do business in Minnesota, and both are American subsidiaries of Exact Holding, N.V. a multinational corporation headquartered in Delft, Belgium.   During Plaintiffs dealings with Defendants, they have identified themselves sometimes as Exact Software North America, Inc., and sometimes as Exact Software North America, LLC.   Any issue with respect to whether one or the other name is correct will be clarified during discovery.  For purposes of this Complaint, Defendants shall be referred to collectively as "Exact."

## JURISDICTION AND VENUE

3.      The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and Plaintiffs and Defendants are respectively citizens of different states.  The Court has subject matter jurisdiction over the claims herein pursuant to 28 U.S.C. § 1332(a).

4.      Venue is proper pursuant to 28 U.S.C. § 1391(a) and (c) and properly lodged in the U.S. District Court for the District of Minnesota.  The Plaintiff has its principal place of business in Minnesota, Defendants have an office in Minnesota and do business in Minnesota, and the conduct complained of occurred in Minnesota.

## GENERAL ALLEGATIONS

### A.    Nature of the Case

5.      Exact was Plaintiff's software provider and database manager for four years.  As such, Exact was entrusted with remote access to virtually all of Plaintiff's confidential and proprietary data and trade secret information.  Plaintiff advised Exact that a third party was purchasing certain of Plaintiff's assets including the Exact software and a portion of Plaintiff's database.  Plaintiff also advised Exact that Plaintiff was to retain the balance of its proprietary data and would need new Exact software to accommodate it.  Exact assured Plaintiff that it had the knowledge, skill and technical ability necessary to transfer and allocate Plaintiff's data properly and according to Plaintiff's instructions.  Plaintiff then engaged, paid and instructed Exact as to the proper and precise allocation of Plaintiff's data between it and the third party.  In discussions with Exact, the third party reiterated and confirmed these instructions and their importance.

6.       In fact, Exact so mishandled the transfer and allocation of data that the third party contacted Exact threatening to sue.  Without Plaintiff's knowledge, Exact sought to defend itself by misrepresenting Plaintiff's instructions and grossly exaggerating the scope of information Plaintiff had retained.  Exact secretly agreed with the third party that if it would refrain from suing Exact, Exact would disclose to the third party *all* of Plaintiff's confidential trade secret information – Plaintiff's entire data base – and assist the third party in litigation against Plaintiff.  Indeed, Exact went so far as to advise the third party that Plaintiff had retained data that was not even accessible on Plaintiff's new Exact software system, and the third party sued Plaintiff based on that misinformation.  Although Plaintiff successfully defended itself in the suit brought by the third party, Exact's wrongful course of conduct, including its negligence, breach of contract, and breach of fiduciary duties of loyalty and confidentiality it owed to Plaintiff, resulted in

devastating damage and loss to Plaintiff.

**B.    Background Facts and Circumstances.**

7.    Between January 2007 and February 2010, Plaintiff Cameron Filters was a manufacturer and distributor of industrial filtration products used for dust control in bag houses and product separation and recapture in industrial driers.

8.    At all relevant times Plaintiff owned and used a "JobBoss" data management system to support its production operations and for matters as diverse as pricing individual "jobs" or orders and maintaining customer and financial information.  JobBoss is a software application marketed and serviced by Exact.  It consists of interrelated "modules" that manipulate data that is stored in the application's central database.

9.    In February, 2010, Plaintiffs sold the manufacturing assets owned by Cameron Filters to American Industrial Filters, LLC ("AIF").

10.    Plaintiff retained its business name and identifying information and continued in business doing marketing and distribution of industrial filter products made by AIF and other manufacturers.

11.    Thus, the asset sale contemplated a continuing relationship between the parties to the sale.

12.    As part of the asset sale and purchase, AIF acquired certain modules of Plaintiff's JobBoss system, including the manufacturing data contained in those modules.

13.    More particularly, AIF acquired the specific modules and the detailed data they required concerning the production requirements and processes for manufacturing thousands of industrial filters – such as "Job Order" modules for creating "travelers" to guide the factory production of the particular "parts" or filters called for by each "job."

14.    AIF also acquired the modules of Plaintiff's JobBoss system used to maintain

4

financial data such as customer sales, receivables and accounts payable, but *not* Plaintiff's data associated with those modules.

15.     In other words, AIF purchased JobBoss tools from Plaintiff which would enable it to create its own financial records, but did not acquire access or rights to Plaintiff's historical financial data which Plaintiff properly classified as confidential business information.

16.     Under a separate provision of the asset sale and purchase - and because Plaintiff was an established customer of Exact - Plaintiff retained the right to purchase and operate a new JobBoss system for Plaintiff's ongoing marketing and distribution operations.

17.     Thus, the JobBoss system contemplated by the parties to the asset sale and purchase, and known by the data handling professionals of Exact, required confidential and mission critical data of the parties to be properly allocated between the parties' respective databases, which were to be loaded on the parties' respective servers.

18.     In return for a fee Exact charged for its installation services, Exact agreed and was directed to populate Plaintiff's new system with Plaintiff's historical financial and customer information, including basic product descriptions and the prices customers had historically paid Plaintiff for the parts or filters they purchased.

19.     Both before and after the closing of the asset sale and purchase transaction between Plaintiff and AIF, representatives of both companies individually and sometimes together spoke with representatives of Exact to ensure that Exact fully understood the precise division of data between Plaintiff and AIF and how critical the management of their data was.

20.     One specific instruction that both Plaintiff and AIF provided to Exact was that *only* AIF's system would contain data relating to "how filter bags were made" -- that is, the detailed data relating to the dimensions of component parts and the processes of producing them.

21.     AIF repeatedly advised Exact that it considered that information not only

sensitive and proprietary but also among the most significant and valuable assets it was

acquiring.  Further, upon information and belief, AIF advised Exact that it was critical that

Plaintiff not retain or regain access to that information after the sale of assets because possessing

that information would enable Plaintiff to circumvent AIF as a supplier and potentially destroy

AIF's new business by providing detailed product and production information for each filter bag

to AIF's competitors.

22.     Exact's data professionals knew that the detailed product and production

information critical to the parties appeared in several tables and or fields within the JobBoss

database and represented that they understood the instructions to "scrub" or delete certain

information from the data they were to use to populate Plaintiff's new system.

23.     Separating the data to be transferred to AIF from the data to be retained and used

to populate Plaintiff's new system was the heart of the service Exact undertook to provide.

24.     Exact repeatedly advised Plaintiff and AIF that it understood these instructions,

appreciated their significance, and that it had the capability, experience and technological

wherewithal to properly scrub the database, and load the correct data into the respective JobBoss

systems.

25.     Exact also repeatedly represented that it would abide by the instructions it

received regarding the management of the parties' confidential, proprietary information.

26.     Exact repeatedly assured Plaintiff that it had the knowledge, skill and technical

expertise necessary to effectuate the parties' intent with respect to the allocation of system data

between Plaintiff's and AIF's respective JobBoss systems.

27.     Exact's assurances of skill, experience and expertise led Plaintiff to repose special

trust and confidence in Exact for purposes of handling the contemplated data exchange between

Plaintiff and AIF.

28.     After the transaction, but before any data was manipulated by Exact, Plaintiff furnished Exact a copy of the Asset Purchase Agreement ("APA") between Plaintiff and AIF for the purpose, among others, of ensuring that Exact could see the provisions and precise language in the APA that governed the allocation of JobBoss data between Plaintiff and AIF.  For example the Asset Purchase Agreement clearly states that "Although the Job Boss system and programs are part of the [sold] Assets, Seller will be entitled to download and maintain its financial and customer information off of that system and to delete its financial information from the system, subject to the supervision of the Buyers."

29.     Exact email communications to its data professionals instruct "Josh's database - rip out routings and Part Notes. . . .[which were to go exclusively to AIF]  Lisa O's database - rip out all accounting [which was to go exclusively to Plaintiff]."

30.     Notwithstanding its undertakings, assurances and duties to Plaintiff, Exact violated the instructions of both Plaintiff and AIF by populating Plaintiff's new JobBoss system with the very same manufacturing data Exact had been repeatedly instructed to delete from the database to be used in conjunction with Plaintiff's new JobBoss system.

31.      Exact further violated the instructions of both Plaintiff and AIF by populating AIF's new JobBoss system with the very same confidential historical financial data belonging to Plaintiff that Exact had been repeatedly instructed *not* to load into AIF's system.

32.     Exact further violated the instructions of both Plaintiff and AIF by failing to populate Plaintiff's new JobBoss system with descriptions of the products sold historically to customers, or with Plaintiff's historical financial data, information to which Plaintiff were entitled under the APA.

33.     In other words, the data professionals of Exact did almost *the exact opposite* of what they had assured Plaintiff and AIF they would do.

34.     Once Plaintiff appreciated the full extent of Exact's errors, it advised Exact to correct them, making clear, among other things, that Plaintiff wanted Exact to immediately scrub from their new database the information to which Plaintiff was not entitled.

35.     AIF also complained to Exact about the error and initially Exact admitted that the error was theirs and that it was substantial.  AIF informed Exact in no uncertain terms that it was furious about the error and contemplating a lawsuit against both Plaintiff and Exact.

36.     Notwithstanding its initial admission to AIF that it was to blame for the mishandling of the data, and in reckless violation of duties it owed to Plaintiff, upon information and belief, Exact then sought to persuade AIF that Plaintiff was at fault and led AIF to believe that Plaintiff was  attempting intentionally to misappropriate what AIF considered valuable trade secrets.

37.     AIF commenced litigation against Plaintiff, alleging, among other things, breach of contract, fraud, and misappropriation of trade secrets.

38.     But for Exact's errors, AIF would have had no reason to and would not have commenced litigation against Plaintiff and Plaintiff would not have incurred any of the damages detailed herein.

39.     Upon information and belief, Exact's efforts to deflect blame exacerbated the situation and virtually assured commencement of the lawsuit by AIF against Plaintiff.

40.     During the litigation between AIF and Plaintiff, Plaintiff learned that AIF had first threatened to commence litigation against Exact for misappropriation of trade secrets, among other grounds.

41.     Plaintiff learned further that Exact had considered the threat of litigation serious enough to warrant the involvement of its American General Counsel, James Workman, at its North American headquarters in Massachusetts.

42.     Exact, through Workman, and AIF had entered into a "stand still" agreement under which Exact would cooperate with AIF in litigation against Plaintiff and thereby save itself from adverse litigation and publicity, as well as expense.

43.     Under other provisions of this "stand still" agreement:

a.      Exact gave AIF access to the entirety of Plaintiff's new JobBoss system, including all of the modules of every kind and all of the data, including Plaintiff's confidential and proprietary data.

b.      Exact gave AIF documents, among others, reflecting all communications Exact representatives had with representatives of Plaintiff and AIF relating to the two companies' respective JobBoss systems and the required division of data.

c.      Exact agreed with AIF that it would not furnish the same documents to Plaintiff or otherwise cooperate with Plaintiff in the litigation between AIF and Plaintiff.

d.      Exact falsely informed AIF that Plaintiff had access to a series of modules capable of accessing AIF's data regarding manufacturing costs, production sequences and efficiencies, detailed production information and other manufacturing data.  Plaintiff did not have access to any of that information and would apparently have gained access to it, if at all, only if in the future Plaintiff upgraded their JobBoss system to a different version.

44.     In other words, through the stand still agreement, Exact needlessly and recklessly inflamed the situation by advising AIF that Plaintiff had received access to substantial information belonging to AIF that Plaintiff did not even have the capability to access.  Exact knew or should have known that such a disclosure would give AIF additional reason to sue Plaintiff and to do so immediately.

45.     Much of the resultant litigation between Plaintiff and AIF arose from Exact's false representations to AIF about the nature and extent of the data retained by Plaintiff.

46.     Exact knew that AIF was considering commencing a lawsuit against Plaintiff.

47.     Upon information and belief, Exact's conduct exacerbated that situation and was a substantial factor in AIF's decision to commence a lawsuit against Plaintiff Cameron Filters in Ramsey County District Court seeking immediately injunctive relief as well as damages.

48.     Exact's decision to disclose Plaintiff's entire confidential database to AIF, a third party, was made negligently and in blatant disregard of its fiduciary duties and in violation of state civil and criminal statutes.

49.     As a direct result of Exact's wrongful course of conduct, Plaintiff was forced to bear the expense and business disruption caused by needless litigation – including Plaintiff's successful defense of a motion for a temporary restraining order and a motion for preliminary injunction, which motions were based in substantial measure on AIF's incorrect understanding and belief that Exact had provided Plaintiff far more of the sensitive and proprietary information AIF had purchased than was in fact the case.  Plaintiff seeks compensatory damages for Exact's initial negligence and breach of contract for mishandling of the parties' data and for Exact's subsequent breaches of fiduciary and other duties owed to Plaintiff.

C.      **Misappropriation of Cameron Filter's Trade Secrets and Confidential Information.**

50.     Cameron Filters possesses confidential proprietary information including trade secrets as part of its business database.

51.     These trade secrets and confidential information include, but are not limited to financial operating information, pricing, customer lists, product sources, and product line information, all of which has been acquired over a substantial amount of time and at significant

expense in time and money.

52.     None of this information is publicly available, generally known or readily ascertainable.  Rather it is the product of Cameron Filters' substantial investments in time and money.

53.     Moreover, this information's economic value is dependent upon it not being available to the public and was secret prior to Exact's misappropriation.

54.     Because of its value, the security of this data has always been a critical corporate priority for Cameron Filters and the company has always had significant security protocols in place to ensure its security.   These protocols have always included: extensive firewalls to prevent hackers from accessing the information, the servers have always been located in a secured location, multi-level password protection has always been in place protecting access to data at each level, which passwords were always secured, the passwords were also changed frequently and access to them was strictly limited to Mr. Kaplan, Ms. Price, and on a need to know basis with the company.

55.     On numerous occasions, Exact was clearly and unequivocally informed of the nature of Cameron Filters' confidential and trade secret information.

56.     Exact had a known duty to maintain the secrecy of Cameron Filters' confidential trade secret information.

57.     Despite this duty, Exact misappropriated Cameron Filters' data by its blatant disregard of Cameron Filters' instructions and disclosure of Cameron Filters' confidential trade secret information to AIF when it knowingly and willfully loaded a complete copy of Cameron Filters' database onto AIF's servers and made it accessible by AIF's JobBoss system.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

58.     Plaintiff repeats and incorporates herein by reference each and every averment

contained in paragraphs 1 through 57 above.

59.     Plaintiff engaged Exact and paid Exact a fee for Exact's undertaking and agreement to transfer certain specific manufacturing data from Plaintiff's existing JobBoss system to AIF and to retain for Plaintiff the balance of Plaintiff's database and upload it into Plaintiff's new JobBoss system.

60.     Plaintiff gave specific instructions to Exact and relied on Exact's agreement and undertaking to follow those instructions in transferring data to AIF and uploading data to Plaintiff's new system.

61.     Exact breached its agreement with Plaintiff by failing to carry out Plaintiff's instructions, by misrepresenting to AIF the scope of the data Plaintiff had retained, and by secretly transferring Plaintiffs' entire database to AIF.

62.     As a direct and proximate cause of Exact's breach of the parties' understandings and agreements, Plaintiff has been damaged in an amount no less than $75,000, along with pre-judgment interest thereon.

## SECOND CAUSE OF ACTION
### (Violation of Uniform Trade Secrets Act - M.S.A. 325C.01)

63.     Plaintiff repeats and incorporates herein by reference each and every averment contained in paragraphs 1 through 62 above.

64.     Plaintiff Cameron Filters possesses confidential and proprietary information including trade secrets as part of its business database.

65.     This confidential and proprietary and trade secret information is comprised of historical data derived over a significant period of time, customer lists not publicly available or ascertainable, product descriptions and pricing information.

66.     None of this information is publicly available, generally known or readily ascertainable.  Rather it is the product of Cameron Filters' substantial investments in time and

money.

67.     Moreover, this information's economic value is dependent upon it not being available to the public and was secret prior to Exact's misappropriation.

68.     Because of its value, the security of this data has always been a critical corporate priority for Cameron Filters and the company has always had significant security protocols in place to ensure its security.

69.     On numerous occasions, Exact was clearly and unequivocally informed of the nature of Cameron Filters' confidential information and was aware, or should have been aware, that much of Cameron Filters' information which Exact took possession of to reload on Plaintiff's new servers as part of a new database created for Plaintiff, was in fact confidential.

70.     Because Exact had been so informed of the confidential nature of Cameron Filters' data, Exact acquired and took possession of Cameron Filters' data under circumstances that gave rise to a duty for Exact to maintain its secrecy.

71.     Despite this duty, Exact misappropriated Cameron Filters' data when it disregarded Cameron Filters' instructions and disclosed Cameron Filters' confidential and proprietary information and trade secrets to AIF by knowingly and willfully loading a complete copy of Cameron Filters' confidential data onto AIF's servers.

### THIRD CAUSE OF ACTION
#### (Computer Malpractice - Negligence)

72.     Plaintiff repeats and incorporates herein by reference each and every averment contained in paragraphs 1 through 71 above.

73.     Under the terms of the parties' written and oral agreements, together with the explicit instructions it received from Plaintiff, Exact incurred a duty of care commensurate with the care of a reasonable member of the computer profession, especially one who purports to routinely handle confidential data and holds itself out as expert in data management and systems

implementation, under the same or similar circumstances.

74.     As one step in the transfer and partitioning of data between Plaintiff and AIF, Exact's staff of "experts" was to remove data from servers initially owned by Cameron Filters, parse it according to the asset purchase agreement between Plaintiff and AIF, and load the appropriate, and only the appropriate data on to Plaintiff's and AIF's servers respectively.

75.     In taking possession of Cameron Filters' data, Exact assumed a duty of care to Cameron Filters to keep their confidential trade secrets secure and to properly populate the parties' databases prior to loading on to Cameron Filters' and AIF's servers as part of its installation of its software.

76.     It egregiously breached that duty by recklessly mixing up data the parties' data and incorrectly loading Cameron Filters' data onto servers belonging to AIF and in so doing, comprising confidential trade secret information belonging to Cameron Filters by making it readily accessible by AIF.

77.     Cameron Filters suffered significant injury due to this breach in that (1) its confidential trade secrets were wrongfully disclosed to a third-party (AIF), and (2) that due to Exact's negligent mishandling of Cameron Filter's data, Cameron Filters was sued by AIF which lawsuit required Cameron Filters to hire legal counsel for its defense.

78.     But for Exact's negligent handling of Cameron Filter's confidential information, no lawsuit would have ensued and Cameron Filters would not have had to engage legal assistance.

79.     Exact is in the business of, indeed, holds itself out as a world-wide expert in system implementation and as such could have, with ordinary care, anticipated that such

wrongful and negligent handling of confidential data would result in a lawsuit. [1]

## FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

80.     Plaintiff repeats and incorporates herein by reference each and every averment contained in paragraphs 1 through 79 above.

81.     Exact stood in a confidential and fiduciary relationship to Cameron Filters at the time it took a complete image of Cameron Filters' data set into its possession by virtue of its position of superior knowledge and technical expertise.

82.     Subsequent to Exact's possession of Cameron Filters' complete data set, it improperly loaded all of that data onto servers belonging to AIF.

83.     Exact knew, or should have known, that all of Cameron Filters' information had been wrongly loaded onto AIF's servers.

84.     The fact that Cameron Filters' information had been mishandled was a fact known only to Exact and not Cameron Filters.  Cameron Filters had absolutely no way to know that its data had been placed on AIF servers as it had no access to AIF's servers.

85.     Exact had both a legal and equitable obligation to communicate the fact that it had improperly exposed Cameron Filter's confidential data, ***and it chose not do so***.

86.     Given Exact's reputation in the marketplace, and the fact that it holds it self out as an expert in data handling and database management, Cameron Filters was reasonable in its reliance upon Exact to properly handle its confidential information.

87.     Cameron Filters' reasonable reliance resulted in it suffering injury.

---

[1]   Exact describes its professional services on its web site like this: "Exact offers a highly qualified and experienced team of consultants to ensure speed and ease of implementations and other projects, delivered on time, within budget, and according to customer expectations."  See http://www.exact.com/us/en/services/professional-services/, last viewed on January 24, 2011.

88.     Such injury was a directly and proximately caused by Exact's breach of fiduciary duty and failure to timely notify Cameron Filters of its actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Cameron Filters, LLC, d/b/a/ HTIF Cameron Filters d/b/a/ HTIF request that this Court enter judgment in its favor and against Defendants Exact Software North America, Inc., and Exact Software North America, LLC as follows:

### First Cause of Action (Breach of Contract):

a.      For losses suffered due to Defendants' breach of contract in an amount not less than $75,000, plus prejudgment interest thereon.

b.      All other such relief as this Court may deem just and proper.

### Second Cause of Action (Violation of Uniform Trade Secrets Act - M.S.A. § 325C.01):

a.      For losses suffered due to Defendants' violation of the Uniform Trade Secrets Act (M.S.A. § 325C.01) in an amount not less than $75,000, plus prejudgment interest thereon.

b.      Because Defendants' actions were willful, Plaintiff prays for exemplary damages in an amount not exceeding twice the Court's award under Paragraph (a) above.

c.      A judgment for such and further relief as this Court may deem just and proper.

### Third Cause of Action (Computer Malpractice - Negligence):

a.      For losses due to Defendants' recklessly mixing up the parties' data and incorrectly loading Cameron Filters' data onto servers belonging to AIF, in an amount not less than $75,000 plus prejudgment interest thereon.

b.      Because Defendants' acts were done in knowing disregard of Plaintiff's rights, Plaintiff is entitled to recover attorneys' fees and punitive damages in amounts to be established by proof at trial.

c.      A judgment for such and further relief as this Court may deem just and proper.

**Fourth Cause of Action (Breach of Fiduciary Duty):**

a.      For losses due to Defendants' recklessly handling Plaintiff's data in direct contravention of explicit instructions which led to legal action being taken against it by AIF, in an amount not less than $75,000 plus prejudgment interest thereon.

b.      Because Defendants' breach of fiduciary duty was willful and malicious, and unjustified or done in knowing or reckless disregard of Plaintiff's rights, Plaintiff is also entitled to recover its attorney's fees and punitive damages in amounts to be established by proof at trial.

c.      A judgment for such and further relief as this Court may deem just and proper.

DATED:      July 11, 2011.

_/s/ Thomas R. Karrenberg_
Thomas R. Karrenberg
Leslie Orgera
Anderson & Karrenberg
50 West Broadway, Suite 700
Salt Lake City Utah 84101

_/s/ Richard A. Kaplan_
Richard A. Kaplan (0053661)
830 Linwood Avenue
Saint Paul, MN 55105

**_Attorneys for Plaintiff_**